The Northern Ohio Railway Company, The Akron, Canton & Youngstown Railroad Company, Successor v. Commissioner.
Northern Ohio Ry. Co. v. Commissioner
Docket No. 8555.
United States Tax Court
1947 Tax Ct. Memo LEXIS 31; 6 T.C.M. (CCH) 1230; T.C.M. (RIA) 47311; November 20, 1947
*31 Where two Ohio railroad corporations have been consolidated in reorganization and the laws of the state provide that upon the consolidation of railroad companies the debts, liabilities and duties of the respective companies shall attach to and be enforcible against the new or surviving company, and the order of the District Court for consummation of the reorganization provides that the new company shall assume all legal obligations of the trustees, including Federal taxes, a notice of deficiency addressed to the successor company is within section 52, I.R.C.
The contract of lease provided that the net earnings, after the payment of all fixed charges and operating expenses, including taxes and expenses of administration, additions, betterments, etc., should be paid over to the lessor as rental, but if in any year the earnings were not sufficient to meet such expenses, then certain expenses, including taxes, were to be paid by the lessee, but any amount so paid by the lessee in excess of the earnings for such year shall be deemed advances by the lessee to the lessor. It is held that Federal income and excess profits taxes accrued for the respective taxable years *32 are not additional rentals payable by the lessee to the lessor under the terms of the lease and the amounts of such accruals are not additional income to the lessor. United States v. Boston & Maine R.R., 279 U.S. 732, distinguished. Warren E. Hacker, Esq., 1857 Union Commerce Bldg., Cleveland, Ohio, for the petitioner. L. R. Bloomenthal, Esq., for the respondent. HARLAN Memorandum Opinion HARLAN, Judge: *33 The Commissioner originally determined a deficiency against petitioner in income and excess profits taxes for the calendar years 1942 and 1943 as follows: Excess Profits
Year
Income Tax
Tax
1942
$49,420.65
1943
$63,899.51
The above deficiencies were based upon respondent's disallowance of accrued interest deductions and his elimination of certain bonds from borrowed capital and from invested borrowed capital in the computation of excess profits tax liability for 1943. The Commissioner's brief herein conceded the incorrectness of his determinations on the above points. This concession leaves the only question for this Court to decide out of those raised by the petition as to whether or not the Commissioner erred in issuing his deficiency notice to the Northern Ohio Railway Company, The Akron, Canton & Youngstown Railroad Company, Successor. However, the Commissioner filed an amended answer herein on March 25, 1946, and requested an increase in the deficiencies as originally proposed from $113,320.16 to $516,920.17 as follows: Year
Kind of Tax
Deficiency
1942
Income
$ 86,772.59
1943
Income
None
1943
Excess Profits
430,147.58
Total
$516,920.17
*34 The increase in deficiency so requested for each year is based by the Commissioner on the theory that the taxable income of petitioner lessor growing out of the leasing of a certain railway property consisted not only of all of the lessee's income derived from the operation of the leased railway after the deduction of all operational charges except income tax, but in addition thereto an amount equal to the total income tax of the lessor, which the Commissioner contends the lessee should also pay the lessor Therefore we are now confronted in this hearing with two questions: (1) Was the notice of deficiency herein correctly issued? (2) Did the taxable income of petitioner consist of the lessee's total net income from the operation of the leased premises after the payment of all charges by the lessee except income tax, plus an amount sufficient to pay lessor's income tax on that net income? The case was submitted on the pleadings and a stipulation of facts which we adopt. The Northern Ohio Railway Company (hereinafter referred to as "Northern") was incorporated August 14, 1895, under the laws of Ohio. The Akron, Canton & Youngstown Railway Company (hereinafter referred to as *35 "Akron") was incorporated June 6, 1907, under the laws of Ohio. At all times pertinent hereto and prior to January 14, 1944, these corporations were common carriers by steam railroad subject to the regulatory jurisdiction of the Interstate Commerce Commission (hereinafter referred to as the "Commission"). Under date of October 1, 1895, Northern leased to The Lake Erie and Western Railroad Company (hereinafter referred to as "Lake Erie") so much of its railroad as had then been constructed, together with such lines of railroad as Northern might later construct or acquire, and in respect of which Northern's First Mortgage Bonds were to be issued, for a term of 999 years. The lease provided: "THIRD. - The lessee, in consideration of the premises, accepts, under the provisions hereof, the premises and property hereby demised for said term hereby granted, and covenants to and with the lessor to pay yearly and every year during the term hereby granted, by way of rental therefor, all the net earnings, to be determined as hereinafter provided, derived from the operation of the demised railroad, rolling stock, equipment and property, and in any event and though such net earnings may not *36 be sufficient therefor: "(a) all taxes that may be imposed, assessed or levied upon the lessor or upon the said demised promises and property or any part thereof as the same shall become due and payable; "(b) the premiums of insurance upon the buildings, rolling stock and equipment demised; "(c) such sum, not exceeding one thousand dollars per annum, as the lessor shall be [by] resolution of its board of directors certify to by requisite for the maintenance of its corporate organization, the salaries of its necessary officers, the compensation of its board of directors and for other expenses of administration, including the expenses of the registration and transfer of its securities; "(d) the coupons maturing upon all the first mortgage bonds of the lessor, issued under the first mortgage of the lessor, or to be issued under the first mortgage in respect of lines of railroad hereafter constructed or acquired by the lessor at the request of the lessee, and which shall become subject to this lease as said coupons mature and become payable, by paying directly the coupons upon such bonds, as such coupons mature respectively, upon the first day of April and October in each year, *37 said coupons to be cancelled as soon as paid. * * *
"SIXTH. - It is mutually covenanted as follows: * * *
"In estimating the net earnings which shall be payable under the terms of this lease by way of rental for the demised premises, there shall be deducted from the gross earnings all fixed charges, all operating expenses, including taxes and expenses of administration, all sums which in the judgment of the lessee shall be necessary to be expended for betterments and additions and the maintenance as a first class railroad of the demised railroad, all sums which shall be necessary fully to equip the demised railroad with sufficient and satisfactory rolling stock and equipment to enable it to transact such business as may be done over it. As between the parties, the lessee shall be entitled to make such charges in respect to the use of rolling stock, terminal facilities or otherwise howsoever, growing out of the operation of the demised railroad in connection with the lines of the lessee, as though this lease had not been made. And the lessee shall be entitled to proper and reasonable compensation for its services in handling, managing and operating the business of the *38 lessor, including thereon services performed and expenses incurred by the lessee's officers, agents and attorneys in and about the business of the lessor. "The lessee shall, immediately after September 30th of each year, make up an account of the earnings of the preceding year; and out of any net earnings shall first pay the fixed charges and other items hereinbefore provided to be paid, and shall thereafter, on or before December 15th of each year, pay over to lessor by way of rental any surplus remaining after such payments. In case in any year the net earnings of the demised railroad and property, as hereinabove determined, shall not be sufficient to meet the fixed charges and operating expenses, the lessee shall, notwithstanding, make the payments hereinabove in subdivision (d) of the third article hereof provided, but any amount paid by the lessee in excess of the net earnings for such year shall be deemed an advance on the part of the lessee to the lessor." On March 1, 1920, Northern was indebted to Lake Erie upon an open book account in the sum of $3,825.049.98. Effective March 1, 1920, Lake Erie assigned to Akron the lease of October 1, 1895, and all indebtedness owed to *39 Lake Erie by Northern, Akron succeeding to Lake Erie's rent obligation. On March 1, 1920, Akron entered upon its books as a receivable from Northern in Account No. 706, "Advances to Affiliated Companies" the sum of $3,825,049.98. As of November 30, 1931, this open account indebtedness had increased to $5,411,197.24. Having defaulted their respective bond interest obligations evidenced by coupons maturing April 1, 1933, Northern and Akron on April 3, 1933, each filed voluntary petition for reorganization in the United States District Court for the Northern District of Ohio, Eastern Division (No. 28282) and with the Commission under the provisions of section 77 of the Bankruptcy Act (U.S.C. Title 11, section 205) on the ground that they were unable to meet their debts as they matured. By order of the same date, the District Court approved these petitions as properly filed and temporarily continued Northern and Akron in possession of their respective properties pending appointment of a trustee in reorganization. At no time has there been an adjudication of insolvency either of Northern or Akron. The District Court by order of April 7, 1933, appointed a temporary trustee in reorganization *40 vesting him with all the title and customary trustee powers and directing him to pay "all taxes and assessments due or to become due upon the railroads and property owned, leased or operated" by Akron and by Northern and "all necessary expenses of operating the railroads, owned, leased or operated" by Akron or by Northern. At all times during the calendar years 1942 and 1943, George E. Hagenbuch and H. B. Stewart, Jr., were the duly qualified trustees, appointed by the District Court and ratified by the Commission, vested with all the title, powers and rights enumerated in the order of April 7, 1933. As of April 4, 1933, the trustees opened and thereafter kept a set of books of account for the trusteeship of Akron and a set of books of account for the trusteeship of Northern. At the direction of the Commission, the Bureau of Accounts of the Commission conducted an investigation of the income accounts of Akron, of Northern, and of the trustees of Akron and of Northern for the years 1930 to 1934, both inclusive, and by order dated October 14, 1936, the Commission directed the Bureau of Accounts to file its report of that investigation. The Bureau of Accounts reported the accounting *41 practice followed under the lease and took no exception to that practice. This report does not specifically refer to the practice followed in accounting for Federal income taxes of Northern or of the Northern trustees. A plan of reorganization, having been duly submitted to the stockholders and those entitled to vote, was accepted over the objection of certain creditors and stockholders. After hearing, the District Court entered an order confirming the plan and denying the motion to refer back. The confirmation order provided in part that the new consolidated company, when the property and business of Akron and of Northern was transferred to it, should assume liability for all taxes due to the United States from Akron, Northern or the trustees "for any taxable period prior to the date of this order, without requiring proof thereof in this proceeding and without prejudice thereto by reason of not having been proved herein." On appeal the order of the District Court was affirmed and certiorari denied by the Supreme Court. From October 1, 1895, to February 1, 1942, the lessees and the lessee trustee followed a consistent accounting practice, using the accrual method on a calendar *42 year basis. (a) A complete separate set of income and expense accounts were kept on the lessee's books to reflect the results of operation of the properties under the lease of October 1, 1895, items of income being credited and items of expense debited. One of these accounts was Account No. 1532, "Railway Tax Accruals." Each month the lessee accrued an amount for the lessor's Federal income tax, if any, by debit to Account No. 1532 and a corresponding credit to Account No. 771-8, "Tax Liability - Income - Northern Ohio," a liability payable account on the lessee's books. The accrual of all other taxes of the lessor was accounted for by monthly debit to Account No. 1532 and offsetting credit to similar liability payable accounts on the lessee's books. (b) The net debit or credit balance in the income and expense accounts was entered monthly in a contra account, Account No. 542, "Rent for Leased Road" on the lessee's books by a debit, if a profit were shown for the month, or by a credit, if a loss, and an offsetting debit or credit, was entered to Account No. 706, "Advances to Affiliated Companies," an asset receivables account on the lessee's books. (c)The net debit or credit *43 balance in the income and expense accounts was entered monthly in Account No. 1509, "Income from Lease of Roads" on the lessor's books, by a credit, if a profit were shown for the month, or by a debit, if a loss, and an offsetting debit or credit, was entered to Account No. 757 "Non-negotiable Debt to Affiliated Companies," a liability payable account on the lessor's books. (d) As Federal income tax payments were made, the lessee debited the amount to Account No. 771-8, supra, and credited Account No. 708-1 "Treasurer's Cash." The payment of all other taxes of the lessor was accounted for in similar fashion. No general cash account was maintained on the lessor's books. During the same period the lessor and its trustees followed a correlated accounting system: (a) In such years as the gross earnings from the leased road were insufficient to meet expenses, including all taxes of Northern, the deficit plus (i) interest paid on Northern bonds and (ii) amounts paid for additions and betterments were treated as an advance from the lessee to the lessor and, together with advances for the working capital of the Akron, Barberton and Belt Railroad Company (hereinafter referred to as "A. *44 B. & B.R. advances"), were entered as a debt owed by the lessor to the lessee in Account No. 757 on the lessor's books and in Account No. 706 on the lessee's books. (b) In such years as the gross earnings from the leased road were sufficient to meet expenses, including all taxes of Northern, but were insufficient to pay interest on Northern Bonds in addition thereto, that deficit plus amounts paid for additions and betterments was treated as an advance from the lessee to the lessor and, together with A.B. & B.R. advances, was entered as a debt owed by the lessor to the lessee in Account No. 706 on the lessee's books. (c) In such years as the gross earnings from the leased road were sufficient to meet expenses, including all taxes of Northern, and to pay interest on bonds, but were insufficient to pay for additions and betterments in addition thereto, that deficit was treated as an advance from the lessee to the lessor, and together with A.B. & B.R. advances, was entered as a debt owed by the lessor to the lessee in Account No. 757 on the lessor's books and in Account No. 706 on the lessee's books. (d) In such years as the gross earnings from the leased road were more than sufficient *45 to meet expenses, including all taxes of Northern, and in addition sufficient to pay (i) interest on Northern bonds and (ii) for additions and betterments, that excess, less A.B. & B.R. advances, was used to reduce the debt owed by the lessor to the lessee, Account No. 757 on the lessor's books and Account No. 706 on the lessee's books. On December 27, 1943, the Commission entered an order authorizing consolidation as contemplated in the plan, and authorizing the consolidated company upon its creation to issue and exchange securities pursuant to the plan and to assume certain obligations incurred by the trustees of Akron and of Northern during the period of their trusteeship. On January 14, 1944, Northern and Akron were consolidated under the Ohio General Code, sections 9025 to 9053, both inclusive, to form the Akron, Canton & Youngstown Railroad Company, hereinafter referred to as the "Consolidated Company," pursuant to an agreement of consolidation approved by the District Court January 12, 1944. On January 27, 1944, the District Court issued its order for consummation of the plan, which order provided in part as follows: "J. That the new company shall assume as of the Closing *46 Time the following obligations of the Trustees: * * *
"(8) All other legal obligations of the Trustees, including, but not limited to Federal, state and municipal taxes lawfully assessed, interline accounts, wages and salaries of employees and liability for personal injuries during the period of trusteeship. For this purpose the new company is authorized to intervene in any proceeding or controversy, to which the Trustees are a party at the Closing Time, in the courts or before any governmental bureau, official or commission, and either to substitute itself for the Trustees or to act for and in the name of the Trustees." On February 27, 1945, the final report of George E. Hagenbuch and H. B. Stewart, Jr., as trustees for Northern, based upon the accounting practice described herein, was approved by the District Court, the said trustees were discharged and their bonds were cancelled. On March 29, 1945, the respondent mailed notice of deficiency setting forth those determinations of deficiency which he now concedes to be in error, addressed as follows: "The Northern Ohio Railway Company, The Akron, Canton & Youngstown Railroad Company, Successor, 12 East Exchange Street, *47 Akron, Ohio." The notice of deficiency upon which these proceedings are based resulted from respondent's audit of the original returns for 1942 and 1943 filed by the Northern trustees. Northern's trustees never claimed that the lessee of the railway property was required to pay Northern's income tax in addition to the lessee's net income from the operation of the leased road. Akron's trustees never allocated on its books any amount for the payment of Northern's income tax and never actually paid such tax, either to Northern or to the United States Government. The trustees duly filed corporate income and excess profits tax returns for 1942 and 1943 in the name of "George E. Hagenbuch and H. B. Stewart, Jr., Trustees, the Northern Ohio Railway Company." The returns for 1942 were filed on March 15, 1943, and the returns for 1943 were filed on May 13, 1944, pursuant to an extension duly obtained. The petitioner contends the deficiencies, if any, are not those of the "Northern Ohio Railway Company, The Akron, Canton & Youngstown Railroad Company, Successors" and therefore the deficiency notice was not properly issued by the respondent. These contentions are apparently based on the *48 assumption that the income from operation during the period of reorganization under section 77 of the Bankruptcy Act was that of the trustees, and not that of the petitioner. Petitioner relies on 415 South Taylor Building Corporation, 2 T.C. 184. In that case the question was whether the income from the operation of an apartment building in the taxable year was that of the corporation within the meaning of the Revenue Act of 1943. The corporation was in the process of reorganization under 77-B of the Bankruptcy Act, and the title and possession of the property were by operation of law lodged in the trustee. In holding the corporation not liable for the tax this Court called attention to the fact that the Chandler Act, section 271, which would have made the Successor Corporation liable, was not enacted until 1938 and was not retroactive and under the applicable statute the liability for the tax was that of the trustee and not the corporation. The case was decided upon the authority of Reincke v. Gardner, 277 U.S. 239. The instant case is readily distinguishable from the South Taylor case, supra, upon the facts and the applicable law. In the South Taylor *49 case while the trustee had taken over the property by operation of law and operated it during the taxable year, he did not file an income tax return as trustee and no provision for payment of the tax was made in any order of the Court in the reorganization proceedings. The instant case involves Ohio corporations. The Ohio General Code, section 9038, provides in part that upon the consolidation of railroad companies: "* * * Debts, liabilities and duties of the respective companies thenceforth shall attach to the new or surviving company, and be enforceable against it to the same extent as if such debts, liabilities and duties had been contracted by it." On January 27, 1944, the District Court issued its order for consummation of the plan of reorganization, effective on February 1, 1944, which date would be the "closing time." The Order provided in part as follows: "J. That the new company shall assume as of the closing time the following obligations of the trustees: * * *
"8. All other legal obligations of the trustees, including, but not limited to Federal, State and municipal taxes lawfully assessed, * * *. For this purpose the new company is authorized to intervene *50 in any proceeding or controversy, to which the trustees are a party at the closing time, in the Courts or before any governmental bureau, official, or commission, and either to substitute itself for the trustees or act for and in the name of the trustees." There is no question but that the new consolidated company is the successor of Northern and that after February 1, 1944, it became liable for any Federal taxes due or to become due whether such taxes were the legal obligation of Northern or of the trustees. We hold, therefore, that the deficiency notice was properly addressed by the respondent to the new consolidated company, cf. Shamrock Oil Co. v. Commissioner, 29 B.T.A. 910, affirmed 77 Fed. (2d) 553, cert. denied 296 U.S. 632; San Joaquin Fruit & Investment Co., 52 Fed. (2d) 123; Alaska Salmon Co., (Successor to Northern Fisheries, Inc.) 39 B.T.A. 455. The remaining issue involves the construction of the contract of lease dated October 1, 1895, more particularly paragraphs Third and Sixth, set out in our findings of fact. It is the contention of the respondent that under the terms of the lease the lessee *51 and its successors were obligated to pay an agreed rental consisting of the net carnings from the property (before Federal income and excess profits taxes) plus Federal income and excess profits taxes. He has accordingly included in the income of the lessor, Northern, the income and excess profits taxes for the taxable years 1942 and 1943, treating such taxes as obligations of the lessor paid by the lessee as rent. The petitioner contends that it is not taxable on any amount in excess of the amount included in the notice of deficiency, i.e., the net income before income and excess profits taxes; that the lease in reality provided for operation and management of the leased property for the account of the lessor; and that it was the intention of the parties, as expressed in the instrument and by their accounting practice extending over the entire term of the lease, that all taxes "imposed, assessed or levied against the lessor" or the leased property (which were to be paid in any event) were to be paid from the earnings if sufficient therefor; but if the earnings were not sufficient, any amount paid by the lessee in excess of the earnings "shall be deemed an advance by the lessee to *52 the lessor." We agree with this contention and have found as a fact that the lease of October 1, 1895 did not provide for the payment of income and excess profits taxes by the lessee as additional rental, but were advances on open account by the lessee to the lessor and constituted an indebtedness of the lessor to the lessee. The Third section of the lease, which is set forth in our findings and which is strongly relied upon by the respondent as supporting his construction of the lease, provides that the lessee pay by way of rental for the leased property all the net earnings derived from operation of the property, "and in any event and though such net earnings may not be sufficient therefor, (a) all taxes that may be imposed, assessed or levied upon the lessor * * *." The Commissioner would have us construe the words "and in any event" as equivalent to "in addition thereto" (to pay by way of rental) all taxes that may be imposed, assessed or levied against the lessor. Reading the contract as a whole and taking into consideration all the surrounding circumstances, we are convinced that the parties never intended this construction. The record strongly supports the contention of *53 the petitioner that the lease, in reality, provided for operation and management of the leased property for the account of the lessor. All the net earnings were to be paid to the lessor as rent and the lessee was to receive compensation for its services. But, while such an arrangement would tend to support the construction of the lease contended for by petitioner, it by no means is controlling. The controlling factor in the construction of the contract of lease, as in any other contract, is the intention of the parties. Such intention must be determined from the four corners of the instrument and the surrounding circumstances. The contract of lease provided that, in determining the net earnings "which shall be payable under the terms of this lease by way of rental for the demised premises," there shall be deducted from the gross earnings all fixed charges and all operating expenses, "including taxes and expenses of administration," together with such sums expended for additions, betterments, rolling stock, equipment and maintenances, as in the judgment of the lessee should be necessary. If any net income or surplus remained after the payment of "fixed charges and other items hereinbefore *54 provided to be paid" it was to be paid over to the lessor as rental. If in any year the net earnings were not sufficient to meet the fixed charges and operating expenses then certain expenses, including all taxes assessed or levied against the lessor or upon the property; insurance upon the buildings, rolling stock and equipment; maintenance of the corporate organization, compensation of officers and directors and expenses of administration; and the interest on first mortgage bonds of the lessor issued or to be issued, were to be paid by the lessee, "but any amount paid by the lessee in excess of the net earnings for such year shall be deemed an advance on the part of the lessee to the lessor." Nowhere in the lease is there any express undertaking on the part of the lessee to pay the taxes as additional rental nor does the lease evidence such an intention. It is well settled that the construction of a contract by both parties is strong evidence of their intention in executing the contract. In Insurance Co. v. Dutcher, 95 U.S. 269, the Supreme Court said: "The practical interpretation of an agreement by a party to it is always a consideration of great weight. The construction *55 of a contract is as much a part of it as anything else. There is no surer way to find out what parties meant than to see what they have done * * *." The books of the parties evidence the construction which they themselves placed upon the terms of the lease. Throughout the period of operation under the lease the books of the lessor, the lessee and the trustees show that taxes, including income and excess profits taxes, if any, were paid from net earnings from the property, in years when there were net earnings, and in years when there were no net earnings, the taxes were paid by the lessee and charged against the lessor on open account. In years when there was a surplus after the payment of all fixed charges and expenses, including taxes, such surplus was credited to the open account on the books of both the lessee and the lessor. In the taxable years 1942 and 1943 income and excess profits taxes were accrued and charged against the net income of the lessor. They were not paid by the lessee. In both years the surplus in net earnings was credited against the open account of cumulated advances by the lessee to the lessor. It is true that in 1942 income taxes in the amount of $73,285 *56 were accrued along with other taxes and deducted as an expense in computing the net credit balance of the lessor and that such net credit balance was treated as net taxable income in the return filed by the trustees for that year. But in his original determination of the fiduciary for 1942 the Commissioner disallowed the deduction and adjusted net income by adding back the $73,285. The petitioner acquiesced in this adjustment and that question is not before us here. For the year 1943 there was accrued on the lessee's books $262,030 for income and excess profits taxes. This amount was charged against the net earings of the lessor, but was not deducted in computing its taxable net income and no adjustment was made as to this item by the Commissioner in his redetermination of petitioner's tax liability for that year. This case is distinguishable on the facts from United States v. Boston & Maine R. R., 279 U.S. 732; Old Colony Trust Co. v. Commissioner, 279 U.S. 716, and related cases, where the contract specifically provided for the payment by the lessee, as part of the rent, of the income taxes assessable against the lessor. On the record before us we *57 are of the opinion that the construction of the lease contended for by the respondent is erroncous and that the parties never intended that the lessee should pay the taxes of the lessor as additional rental. Decision will be entered under Rule 50.